[Cite as *In re V.H.*, 2019-Ohio-3097.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

|                          |     |              |
|--------------------------|-----|--------------|
| IN RE V.H., ET AL.       | :   |              |
|                          | :   | No. 107599   |
| Minor Children           | :   |              |
|                          | :   |              |
| [Appeal by A.H., Mother] | :   |              |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** August 1, 2019

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD18905130, AD18905131, AD18905132, and AD18905133

### *Appearances:*

Nee Law Firm, L.L.C., and Leigh S. Prugh, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michelle A. Myers, Assistant Prosecuting Attorney, *for appellee* C.C.D.C.F.S.

Mark A. Stanton, Cuyahoga County Public Defender, and Britta A. Barthol, Assistant Public Defender, *for appellee* B.M.

RAYMOND C. HEADEN, J.:

{¶ 1}  Appellant A.H. (Mother) appeals a decision of the Cuyahoga County Court of Common Pleas, Juvenile Division, that adjudicated child V.H. was abused

and children R.S., M.S., and T.M. were neglected.  For the reasons that follow, we reverse and remand the case to the trial court for further proceedings consistent with this opinion.

**Statement of the Facts**

{¶ 2}   Appellant A.H. ("Mother") and T.H. ("Father") are married and are the parents of V.H. who was six months old at the time of the emergency custody hearing.  Mother also has three children from prior relationships, R.S., M.S., and T.M., aged eight, six, and three respectively.  R.S. and M.S. are the children of Mother and Ro.S., and T.M. is the child of Mother and B.M.  At all relevant times, Mother had custody of R.S., M.S., and T.M.

{¶ 3}   On April 17, 2018, Mother left V.H. and T.M. at home with Father while Mother took R.S. to a doctor's appointment.  M.S. was at school.  Conflicting evidence was introduced whether Father worked the night shift the day before.  When Mother left the house, Father was awake, six-month-old V.H. was sleeping in the parents' bed, and three-year-old T.M. was asleep in his bedroom situated across the hall.  Father was tired and since both children were asleep, he returned to sleep in the bed with V.H.

{¶ 4}   Father awoke to crying from V.H. and T.M.  Father found the children on the floor at the foot of his bed, with T.M. holding V.H.  It was soon apparent that V.H.'s arm was injured.  V.H. was treated immediately at an emergency room for a fractured arm.  While Mother, who was not home when the incident occurred, and

Father did not know the exact cause of V.H.'s broken arm, they surmised T.M. attempted to pull her off the bed and V.H. fell to the ground, breaking her arm.

{¶ 5} Although the hospital records were not included as part of the record, testimony referenced those medical documents. According to the testimony, the hospital records indicated that V.H.'s broken arm was consistent with a fall. There was also testimony from Chloe Scott, a child protection specialist with the Cuyahoga County Department of Child and Family Services ("CCDCFS"), that states V.H.'s injury was sustained as she was passed back and forth between her brothers, R.S., and T.M. However, the record indicates that R.S. was not home when V.H. was injured which disputes the testimony of Chloe Scott. At no other time is there mention of V.H.'s brothers passing her back and forth as an explanation offered for V.H.'s injury.

{¶ 6} CCDCFS was informed of V.H.'s injury. Chloe Scott initiated an investigation and met with Mother and Father on April 17, 2018. Father initially refused Ms. Scott entry into the house until Mother arrived home; Father was not T.M.'s parent and felt Mother needed to be present for discussions regarding T.M.

{¶ 7} Mother and Father were not receptive to CCDCFS's suggestion of placing V.H. in a location inaccessible to the three year old, T.M., or making alternate sleeping arrangements for V.H. The couple stated sleeping with an infant was not illegal and V.H. slept best in a shared bed with her parents. CCDCFS attempted to adopt a safety plan, but Mother and Father were unwilling to cooperate. The parents agreed Father should not watch the children after working

a third shift, although this was not typically an issue since Mother was usually home during the day. Ms. Scott noted the house was cluttered and full of dog fur from the family's three dogs. V.H. slept in the parents' room while the three older children slept in the room across the hallway. The children's bedroom contained two beds for the three children.

{¶ 8} Ms. Scott also discussed with Mother and Father an open investigation dating from March 2018. At that time, R.S., self-reported that he put a toy in V.H.'s crib causing her an injury and, as a result, Father disciplined him by "punching" R.S. in the back. CCDCFS reported to their home in March 2018, but was not permitted to speak independently to R.S. The parents denied such discipline occurred and the social worker did not observe any cuts or bruises on R.S. The social worker did not lift the child's shirt to examine his back. That complaint was left open within CCDCFS's system, but no further follow-up occurred.

{¶ 9} Ms. Scott attempted to schedule a staffing meeting with Mother and Father regarding V.H. Mother and Father informed Ms. Scott they were not available the next morning, April 18, 2018, because of a previously scheduled doctor's appointment. Due to Father's aggressive behavior towards Ms. Scott, she found it necessary to leave the home without scheduling a subsequent meeting.

{¶ 10} A staffing meeting was held by CCDCFS the morning of April 18, 2018. Ms. Scott left a voicemail message for Mother notifying her about the date and time of the staffing meeting, even though she had been told Mother and Father were unavailable at that time due to a previously scheduled doctor's appointment.

Ms. Scott later realized that message was left at the wrong phone number and attempted to schedule another staffing meeting with Mother and Father. Mother and Father provided no amenable dates due to their busy schedules.

{¶ 11} Ms. Scott felt the parents were not taking the situation seriously because they did not appear willing to change their sleeping patterns and she discontinued any attempt to schedule a second staffing meeting. Ms. Scott attempted to notify the parents about a scheduled emergency temporary custody hearing via telephone but Mother would not take the information and hung up on Ms. Scott. A coworker of Ms. Scott left a voicemail for Mother with information relevant to the emergency hearing. Mother returned the coworker's call, but Ms. Scott did not know the details of the conversation.

{¶ 12} Mother and Father recalled a different version of the facts. Because of previously scheduled doctor's appointments for R.S. and V.H., Ms. Scott and the parents agreed to hold a staffing meeting on April 20, 2018, at 9:00 a.m. by phone. The parents received a call from Ms. Scott at 10:00 a.m. stating she had called the wrong phone number and the staffing meeting was held without the parents. A subsequent meeting was to be held, via phone, that afternoon, after V.H.'s 12:30 p.m. doctor's appointment. Mother and Father received two voicemail messages the afternoon of April 20, 2018, stating an emergency custody hearing was scheduled at 2:00 p.m. and the parents must be present.

{¶ 13} An emergency temporary custody hearing on April 20, 2018, addressed CCDCFS's emergency complaint alleging V.H. was abused and neglected.

CCDCFS sought temporary custody of V.H. Ms. Scott testified removal of V.H. was necessary to alleviate any risk to the child — the basis for removal was lack of parental supervision, the concern of V.H. sleeping with her parents, and the possibility that she may fall out of bed. The guardian ad litem also recommended removal based upon the family's uncooperative attitude; the different stories relayed as to how V.H. injured her arm; and the young age of V.H. The court determined CCDCFS made reasonable efforts to prevent removal, including safety planning, but more services were required to alleviate risks to V.H. A motion for predispositional temporary custody for V.H. was granted and a case plan was to be filed within thirty days. Mother and Father attempted to attend the emergency temporary custody hearing, but went to the wrong address. The couple arrived at the correct location after the hearing had concluded and were confronted by CCDCFS employees and police officers who immediately took custody of V.H.

{¶ 14} A magistrate then held a predispositional temporary custody hearing on May 21, 2018, to determine whether the removal of R.S., M.S., and T.M. from Mother's home was in their best interest. Ro.S., the father of R.S. and M.S., and B.M., the father of T.M., were present at the hearing. Ro.S., B.M., and CCDCFS all stated it was not in the best interest of the children to remove them from Mother's custody.

{¶ 15} Ms. Scott testified about the children. Ms. Scott determined R.S.'s school attendance was poor at the start of the year, but he was currently doing well. R.S. had an IEP for behavior, but no evidence was introduced regarding any

problems. Ms. Scott had not spoken with the school regarding M.S. Some of Ms. Scott's statements were not well supported: "There [were] some concerns raised about the physical discipline. I'm not sure to what extent but there [were] some concerns in the way of her treatment of the children." Ms. Scott further stated the children's fathers and school staff reported concerns regarding Mother's physical discipline; her yelling and screaming at the children; and an incident where Mother allegedly "whipped" the children in a store. Testimony stated the three children were bonded with one another. Mother and Father's home was appropriate because the family was provided with heat, food, and electricity. Ro.S. had some concern regarding Mother's physical discipline but supported placement of his children with Mother and did not believe they were in immediate harm. Similarly, B.M. was concerned that Mother would yell and scream at T.M., but he did not believe his son was at immediate risk. Ro.S. and B.M.'s homes had not been investigated by CCDCFS, nor were the fathers included in the April 18, 2018 staffing meeting.

{¶ 16} CCDCFS felt Mother lacked adequate parenting skills as demonstrated by her general lack of knowledge about the hazards of sleeping with an infant and leaving Father in charge of the children after he had worked a third shift. However, CCDCFS recommended it was in the best interests of R.S., M.S., and T.M. to remain with Mother because the disciplinary concerns could be addressed through agency-provided services; Mother and Father were willing to avoid Father caring for the children after working a third shift; the biological fathers of the three

children were involved and had regular contact with their children; and R.S. and M.S. were in school providing them with regular contact with nonfamilial adults.

{¶ 17} The agency had presented a case plan to Mother and Father approximately one week after CCDCFS took custody of V.H. The agency ordered both a drug screen and mental-health assessment because the parents were angry and the agency was concerned about their anger management. The parents seemed willing to comply with the parenting courses and mental-health and drug screenings, but wanted to confer with their attorney prior to committing to the case plan. CCDCFS found Mother and Father's response to the proposed case plan reasonable. However, at the close of the predispositional temporary custody hearing, counsel for Mother and Father indicated the parents were unwilling to attend parenting classes and felt no case plan was necessary.

{¶ 18} The court determined that because the parents refused agency services, it could not say it was in the children's best interest to remain with the parents. The children were placed in the predispositional temporary custody of CCDCFS. R.S. and B.M. were to be considered first for placement of their children. The court ordered Mother and Father to undergo mental-health assessments and drug screenings.

{¶ 19} Trial was held on July 6, 2018, to determine the disposition of all four children. CCDCFS continued to attempt implementation of a case plan for Mother and Father. CCDCFS testified the parents were very argumentative during weekly visitations with V.H., focusing on their anger toward the agency rather than working

to reach the agency's requested goals. CCDCFS wanted Mother and Father to complete the case plan objectives. Mother and Father underwent mental-health and substance-abuse assessments with Recovery Resources on June 19, 2018. A letter from Recovery Resources indicated no treatment was recommended for Mother while a follow-up letter regarding Father requested he contact the facility. CCDCFS was concerned with this care provider since the assessment was based upon information provided exclusively by the parents. The agency preferred an agency-recommended provider that accepted information from both the parents and CCDCFS. The parents refused to sign a release of information; this document was required before CCDCFS could refer the parents to agency services.

{¶ 20} The children had adapted to their various placements — V.H. in foster care, R.S. and M.S. with Ro.S., and T.M. with B.M. There was no concern about the children's safety. Mother and Father had visitation with V.H. and Mother had visitation with her other three children. Mother was difficult facilitating visitation times with Ro.S. Mother raised allegations about Ro.S., Ro.S.'s girlfriend, and B.M. The basis of the allegations is unknown and the record does not reflect whether any claims were filed with CCDCFS. Mother and Father had changed their residence and lived in a two-bedroom trailer with Mother's parents that would not be suitable if Mother had custody of her four children. The permanency plan for all four children continued to be reunification with Mother.

{¶ 21} At the trial, CCDCFS requested temporary custody of the four children with the agency; Ro.S. sought custody of R.S. and M.S.; B.M. requested

custody of T.M.; and the guardian ad litem recommended temporary custody to the agency since she had not completed an investigation of Ro.S. and B.M. to make an appropriate recommendation of them as custodial parents. Mother and Father requested placement of the children with the agency rather than with either Ro.S. or B.M.[1]

{¶ 22} The court found (1) it was in the best interest of V.H. to grant temporary custody to CCDCFS with approval of the permanency plan for reunification with Mother and Father; (2) it was in the best interest of R.S. and M.S. to be in the legal custody of their father, Ro.S., with protective supervision and approval of the permanency plan of reunification; and (3) it was in the best interest of T.M. to be in the legal custody of his father, B.M., with an order of protective supervision and approval of the permanency plan of reunification. Mother and Father were ordered to comply with the court diagnostic clinic's evaluation. The temporary custody order and two protective supervision orders are still in effect.

{¶ 23} On July 6, 2018, an adjudicatory hearing was held before a magistrate, and evidence was submitted. The magistrate found it was contrary to the best interest of the four children to be returned to the home of Mother. The

---

[1] On May 21, 2018, Mother and Father filed an answer to magistrate's pretrial order and findings of fact and emergency temporary custody. The answer was in response to the magistrate's orders implemented on April 20, 2018, regarding V.H. On May 30, 2018, Mother and Father filed a motion to set aside the magistrate's order stating an objection to removal of R.S., M.S, and T.M. from Mother and Father's home. The motion to set aside the magistrate's order was subsequently withdrawn on June 28, 2018, and journalized on July 3, 2018. The request on July 6, 2018, was Mother and Father's first request to place R.S., M.S., and T.M. with the agency rather than with their biological fathers.

magistrate further found CCDCFS made reasonable efforts to prevent removal of the children, to eliminate the continued removal of the children from the home, and to make it possible for the children to return home. The magistrate's decision and findings of fact found relevant services were provided to the family in the case of V.H. but Mother and Father refused to cooperate with referrals to the court diagnostic clinic and for parenting classes at the Westside Collaborative. V.H. was adjudicated abused, the case plan was approved, and the permanency plan remained reunification.

{¶ 24} In the cases of R.S., M.S., and T.M., Mother refused to cooperate with the same referrals to court diagnostic clinic and for parenting classes at the Westside Collaborative. The three children were adjudicated neglected and legal custody was granted to the biological fathers with protective supervision of CCDCFS. The case plans were approved and the permanency plans remained reunification. Subsequently, an order journalized on July 26, 2018, indicated the trial court adopted the magistrate's decisions related to the adjudicatory and dispositional recommendations.

{¶ 25} Mother filed this timely appeal on August 27, 2018.

**Law and Analysis**

{¶ 26} In the first assignment of error, Mother argues the trial court's adoption of the magistrate's decisions related to the adjudicatory and dispositional recommendations for V.H., R.S., M.S., and T.M. were against the manifest weight of the evidence.

**{¶ 27}** "The decision to adopt, reject, or modify a magistrate's decision by a trial court will not be reversed on appeal unless the trial court's decision amounts to an abuse of discretion, which has been defined as an error of law or judgment that implies the trial court's attitude is unreasonable, arbitrary, or unconscionable." *In re S.H.*, 8th Dist. Cuyahoga No. 100911, 2014-Ohio-4476, ¶ 7, citing *Fackelman v. Micronix*, 8th Dist. Cuyahoga No. 98320, 2012-Ohio-5513, ¶ 5. However, this standard does not apply where an appellant fails to object to the magistrate's decision and fails to file a transcript of the hearing for the court's review.

**{¶ 28}** Mother and Father failed to object to the magistrate's decision. "When a party has failed to file objections to a magistrate's decision, an appellate court's review of the trial court's decision is limited to review for plain error." *S.J. v. J.T.*, 6th Dist. Lucas No. L-11-1011, 2011-Ohio-6316, ¶ 8, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997). Plain error is not favored and is only applicable in rare cases where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *In re S.J.* at ¶ 8, quoting *Goldfuss* at syllabus.

**{¶ 29}** Mother and Father also failed to file a transcript of the magistrate's proceedings with the trial court. A party objecting to a magistrate's factual finding is required to support the objection with a transcript of all the evidence submitted to the magistrate relevant to that finding. Juv.R. 40(D)(3)(b)(iii). "If the objecting party fails to provide the court with a transcript of the magistrate's hearing, the trial

court may properly adopt a magistrate's factual findings without further consideration." *In re S.H.* at ¶ 13. Under those circumstances, an appellate court is precluded from considering the transcript when it is submitted with the appellate record. *In re A.L.*, 8th Dist. Cuyahoga No. 99040, 2013-Ohio-5120, ¶ 12. Without the transcript properly before it, an appellate court has no basis to conclude that the trial court erred in adopting the magistrate's decision.

{¶ 30} In the case sub judice, Mother and Father did not object to the magistrate's decision so our review of the trial court's decision is limited to plain error. Additionally, even though a transcript of the magistrate's hearing is before this court, because the transcript was not filed with the trial court, we may not consider it when reviewing factual findings. *See In re S.H.*, 8th Dist. Cuyahoga No. 100911, 2014-Ohio-4476, at ¶ 16. Based upon our review of the limited record, we are unable to conclude the trial court's order of temporary custody constitutes plain error.

{¶ 31} At this court's request, the parties submitted supplemental briefs addressing whether trial counsel was ineffective when he failed to object to the magistrate's decision. Mother's second assignment of error argues trial counsel's failure to object to the magistrate's decisions constituted ineffective assistance of counsel.

{¶ 32} An initial issue is whether we can review the transcript in evaluating this assignment of error. Typically, where the transcript of the magistrate's decision was not filed with the trial court, the transcript is not part of the trial court's record

and an appellate court cannot review the transcript, upon appeal, to address factual findings. *See In re S.H.*, 8th Dist. Cuyahoga No. 100911, 2014-Ohio-4476. *See also In re Comer*, 10th Dist. Franklin No. 96APF11-1571, 1997 Ohio App. LEXIS 4348, 5 (Sep. 23, 1997). However, appellate courts have reviewed transcripts for the purpose of determining whether the appellant was prejudiced by counsel's ineffective assistance, despite the fact that the transcript was not available to the trial judge:

> First, we presume that the failure to file a transcript for review by the trial judge is associated with the failure to request findings of fact and the failure to object to the magistrate's report. Second, because of the nature of the alleged errors, it would be impossible to apply the second prong of the *Strickland* test without considering the evidence presented to the magistrate.

*In re Comer* at 5-6, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also In re P.D.R.*, 5th Dist. Stark No. 2010-CA-00268, 2011-Ohio-1036, ¶ 22. In the interest of justice, this court will examine the transcript of the magistrate's hearings, despite the fact that it was not available to the trial judge. *In re Oliver*, 5th Dist. Licking No. 2005-CA-40, 2005-Ohio-5792, ¶ 24.

{¶ 33} In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) his counsel was deficient in some aspect of his representation, and (2) the deficient performance prejudiced the defendant. *In re J.G.*, 8th Dist. Cuyahoga No. 100681, 2014-Ohio-2652, ¶ 32. This standard of review is applicable in custody proceedings and is applied below when assessing Mother's claim of ineffective counsel. *Id.* at ¶ 32. Moreover, when a reviewing court considers an ineffective assistance of counsel claim, the reviewing court should not consider

what, in hindsight, may have been a more appropriate course of action. *See State v. Phillips,* 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). Rather, the reviewing court "must be highly deferential." *Strickland* at 689. As the *Strickland* court stated, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶ 34} A reviewing court must evaluate the allegations of ineffective counsel on a case-by-case basis and satisfy both prongs of the *Strickland* analysis. Here, trial counsel's failure to file objections to the magistrate's decision or order impacted the temporary custody of Mother's children and, outside of an appeal, was the Mother's only opportunity to attempt to reverse the magistrate's decision. Trial counsel's failure to object to the magistrate's report constituted deficient performance under the first prong of the *Strickland* test. *In re Comer* at 5. We must also assess whether the failure to file objections prejudiced Mother to such an extent that she was deprived a fair trial, thereby satisfying the second prong of the *Strickland* test. To show prejudice, the appellant must demonstrate that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *In re A.G.*, 8th Dist. Cuyahoga No. 105254, 2017-Ohio-6892, ¶ 59.

**{¶ 35}** CCDCFS alleged V.H. was abused and R.S., M.S., and T.M. were neglected. If there is a reasonable probability that Mother's filing objections would have resulted in the trial court not adopting the magistrate's decision and findings of fact, the second *Strickland* prong is met. To make this determination, we must complete an analysis similar to that applied by the trial court.

**{¶ 36}** To adjudicate a child as "abused" we look to R.C. 2151.031 and determine if V.H. meets the statutory definition:

> As used in this chapter, an "abused child" includes any child who:
>
> (A) Is the victim of "sexual activity" as defined under Chapter 2907 of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child;
>
> (B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child;
>
> (C) Exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it. Except as provided in division (D) of this section, a child exhibiting evidence of corporal punishment or other physical disciplinary measure by a parent, guardian, custodian, person having custody or control, or person in loco parentis of a child is not an abused child under this division if the measure is not prohibited under section 2919.22 of the Revised Code.
>
> (D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.
>
> (E) Is subjected to out-of-home care child abuse.

R.C. 2151.031(A) is inapplicable because there were no allegations of sexual activity. R.C. 2151.031(B) requires clear and convincing evidence that the child was endangered as defined in R.C. 2919.22.

{¶ 37} R.C. 2919.22 reads, in pertinent part:

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child.

"[T]o support a conviction for child endangering under R.C. 2919.22(A), it must be established, beyond a reasonable doubt, that [parent] (1) recklessly (2) created a substantial risk to the health or safety of one or more of his children (3) by violating a duty of care, protection or support." *Cleveland Hts. v. Cohen*, 2015-Ohio-1636, 31 N.E.3d 695, ¶ 25 (8th Dist.).

{¶ 38} The evidence does not support a finding that V.H. was endangered. Mother left the house to take R.S. to the chiropractor. Mother left Father in charge of both V.H. and T.M. Both children were sleeping when Mother left the home. Father went back to sleep. He and Mother commonly slept with V.H. and Father did so on the morning of April 17, 2018. Father and Mother believe T.M. awoke that

morning and entered the bedroom where Father and V.H. were sleeping. Father awoke to the children's cries and found T.M. seated on the floor at the foot of the bed, holding V.H. A thorough review of the record supports Mother and Father's version of the facts that T.M. attempted to pick up or move V.H. and she fell to the ground injuring her arm. The parents maintained this story throughout the proceedings. The alternate suggestion that V.H. was injured while being passed back and forth between R.S. and T.M. was unsubstantiated. A doctor's note confirmed R.S. was not home at the time of the injury and this version of events was mentioned only in the emergency records.

{¶ 39} While V.H. was injured under Father's watch, Father's behavior did not rise to being "reckless" or creating "substantial risk." Ms. Scott of CCDCFS focused on Mother and Father's sleeping with V.H. as the source of abuse. However, sleeping did not satisfy the definitions of "reckless" or "substantial risk." The parents testified their doctor was aware of this sleeping arrangement and never voiced any concerns and did not indicate the practice was comparable to abuse.

{¶ 40} Ms. Scott also alleged negligent supervision because Mother left the children in Father's care after he worked a night shift and he was sleeping when Father was in charge of V.H. and T.M. Conflicting evidence was introduced whether Father worked a night shift the day prior to V.H.'s injury. Father testified he was awoken by Mother when she left the house and she did not know he went back to sleep. Regardless, it seems unreasonable to state V.H. was endangered because Father slept at the same time as she and T.M. Typically, parents sleep at night at the

same time as their children; children wake up and can move about the house. Such behavior is neither reckless nor placing a child at a substantial risk. A baby gate on the parents' bedroom doorway could have remedied T.M. and the other children having access to V.H. while she slept and such a solution would have been a far less disruptive resolution in comparison to removing V.H. from her parents' custody. Father testified he and Mother initially were hesitant to change their sleeping habits with V.H., but subsequently told CCDCFS via telephone that they were willing to sleep separately from V.H.

{¶ 41} Lastly, CCDCFS referenced the March 2018 incident that was self-reported by R.S. R.S. alleged Father "punched" him in the back as a form of discipline. Ms. Scott spoke with Father and R.S. about the incident and there was no testimony substantiating the allegations. While R.S. was interviewed in front of both his Mother and Father, he did not state he had been punched. R.S. goes to school each day where he interacts with teachers and adults. Presumably, R.S. could have reported any complaints in his school setting yet no such reports were relayed to CCDCFS. The record could be viewed, within a reasonable probability, not to support an allegation that V.H. was an endangered child in accordance with R.C. 2151.031(B).

{¶ 42} R.C. 2151.031(C) defines an abused child as one who "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it." As stated previously, Mother and Father stated V.H. sustained a broken arm when her

brother, T.M., pulled her off of the bed or attempted to pick her up from the bed. A different version of the facts was reflected in the emergency records where it was written R.S. and T.M. were passing V.H. back and forth when she fell to the floor. That account did not factually make sense since Mother and R.S. were not at home when the incident occurred. Also, subsequent to the emergency room visit, Mother and Father consistently stated V.H. was injured when T.M. attempted to move her from bed. While V.H.'s injury was unfortunate and measures should have been taken to avoid a repeat occurrence, the event could have been categorized as an accident. The facts could have been interpreted, within a reasonable probability, as showing V.H. was not an abused child under R.C. 2151.031(C).

{¶ 43} No facts were presented to suggest Mother and/or Father undertook acts causing V.H. to suffer a physical or mental injury or that harm or threaten to harm V.H.'s health or welfare. Additionally, no facts were introduced supporting an allegation of out-of-home care child abuse. Absent such evidence, the record, within a reasonable probability, can be seen as not supporting an allegation of abuse under R.C. 2151.031(D) or (E). Based upon the foregoing, there is a reasonable probability that but for counsel's failure to object to the magistrate's decision and findings of fact, the trial court would not have found V.H. abused.

{¶ 44} The record also reflected a reasonable probability that the trial court would not have adopted the magistrate's decision and findings of fact to adjudicate R.S., M.S., and T.M. as neglected. In the instant case, neglect could have been argued under R.C. 2151.03(A)(2) or (A)(3):

(A) As used in this chapter, "neglected child" includes any child:

* * *

(2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;

(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;

* * *

{¶ 45} The initial complaint against Mother and Father presented these allegations:

(1) Mother lacked adequate parenting skills which placed the children at risk of harm. Specifically, Mother left V.H. and T.M. in the care of Father after Father had worked a night shift and as a result, Father was sleeping when he was supposed to be caring for the children.

(2) Mother failed to adequately supervise the children based upon an allegation that V.H. was injured during play with R.S. and T.M.

(3) Father inappropriately disciplined R.S. by punching him in the back.

Mother left two sleeping children, V.H. and T.M., under the care of Father. Mother and Father's behavior towards R.S., M.S., and T.M. exhibited adequate parental care and the provision of proper and necessary care as required under R.C. 2151.03(A)(2) and (A)(3). R.S. was allegedly struck once by Father. CCDCFS became aware of this self-reported incident, completed an investigation, and filed no complaint on the allegations. The magistrate voiced her displeasure that the investigating social worker was unable to talk with R.S. away from Mother and Father and did not

examine under R.S.'s shirt to ensure there was no bruising or visible marks. However, the conversation between the social worker and the family did not support any allegation against Mother and/or Father. R.S. attended school daily and had regular visits with his biological father, Ro.S. R.S. presumably, could have shared any abuse or neglect with those caregivers yet no such behavior was reported. The father, Ro.S., voiced concerns about Mother and Father's discipline and yelling, but he supported keeping his children, R.S. and M.S., in Mother's custody rather than removing them to CCDCFS's temporary custody.

{¶ 46} The only testimony introduced regarding M.S. was that she initially missed a number of days of kindergarten, but her attendance improved by the end of the year. And the only evidence regarding T.M. was that Mother left him in the care of Father on a morning after Father allegedly worked a night shift. Father denies working a night shift on the night in question. On the day V.H. was injured, T.M. was sleeping when his mother left the house. Mother was normally home during the day to care for T.M. There was a reasonable probability that the trial court would not have adjudicated the three children neglected if Mother and Father's counsel had filed objections to the magistrate's decision.

{¶ 47} But for the ineffective assistance of counsel provided to Mother and Father, the above objections would have been raised in response to the magistrate's decision and there is a substantial probability that the trial court would not have adopted the magistrate's decision and findings of fact. For the foregoing reasons, we find merit in Mother's second assignment of error and remand the case so

Mother has an opportunity to file objections to the magistrate's order and file a transcript of the proceedings with the trial court.

{¶ 48} Judgment reversed and remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover of appellees the costs herein taxed. Costs waived.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
RAYMOND C. HEADEN, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
EILEEN T. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY